## Kuhns *against* The Westmoreland Bank.

The lien which a bank has, by virtue of the seventh section of the act of 21st March 1814, upon the stock of its debtor, results for the benefit of the surety of such debtor: and such is that resulting interest, that the surety cannot be deprived of it. Hence, if the bank permit the stock of such debtor to be sold, and its proceeds applied to discharge a debt due to the bank by the same debtor which originated by a note of a subsequent date, the surety in the first transaction will be thereby discharged.

ERROR to *Westmoreland* county.

This was an action by the Westmoreland Bank of Pennsylvania against the administrators of John Kuhns deceased, upon a note of 5th of March 1833, for 1530 dollars, of John Schaeffer to John Kuhns, and indorsed by him to the plaintiff, by whom it was discounted, and regularly protested for non-payment.

The defendants gave in evidence that the note in question was originated on the 20th of July 1814, and was then for 4000 dollars, and had been renewed many times up to the date of the note on which the suit was brought; which was the last renewal. That when the note was originally discounted, and previously, on the 14th of May 1814, John Schaeffer, the drawer, was the owner of fifty shares in the capital stock of the said bank; and that he became the owner of fifteen other shares by transfer to him on the 30th of January 1819. They then exhibited the record of judgment of Arthur Carr against John Schaeffer and William Johnston, which was marked for the use of the Westmoreland Bank, entered 22d of March 1820, for 3000 dollars: this judgment was for a debt due to the bank on a note dated 16th of August 1815, of John Schaeffer, on which Arthur Carr was the indorser; and was, therefore, marked for the use of the said bank. On this judgment a *fieri facias* issued in 1825, which was levied upon sixty-five shares of the capital stock of the Westmoreland Bank, as the property of John Schaeffer, which were sold and purchased by, and assigned to the said bank, by the sheriff on the 18th of January 1826, for 1236 dollars 38 cents.

The plaintiff then gave in evidence that John Schaeffer was one of the firm of William Johnston & Co., for whom several notes had been discounted by the bank.

The defendants requested the court to charge the jury upon the following points:

1. That the indorser has an interest in the lien given to the bank, by the seventh section of the act of 21st March 1814, on the stock of the bank belonging to the debtor.

2. That the debt for which the note of John Schaeffer was given,

[Kuhns v. The Westmoreland Bank.]

indorsed by the defendant's intestate, was the first lien on the stock of John Schaeffer, and should therefore have priority in the order of payment out of the proceeds of the sale of said stock.

3. That the Westmoreland Bank, by taking in execution and selling on a judgment, for its use, the stock of said John Schaeffer, and buying the same, discharged the indorser.

But the court answered them in the negative, being of opinion that the lien was for the exclusive benefit of the bank; and the jury found for the plaintiff 2408 dollars.

*Findley*, for plaintiff in error, contended, that it was upon the faith of the stock, which the law had pledged to the bank as its security, that the defendant's intestate had indorsed the original note. The subsequent renewals of the note were but formal continuations of the original contract, with all the original circumstances which surrounded it. To take from him that security which he certainly once had, and apply it to relieve another indorser, is an interference with his vested rights, such as will discharge his liability. To say that an indorser has an interest in the security which the stock of the drawer affords, is asking to take nothing from the bank, but only to demand that the bank shall not take from him this indemnity, and apply it to another debt of their own, which they permitted to be contracted, not at all upon the faith of that stock, which they knew had been previously hypothecated.

*Foster*, for defendant in error.

A mortgage is a specific lien, on specific property, for a specific debt.

A judgment is a general lien for a specific debt.

A surety is therefore, if he pays the debt, entitled to the security by substitution.

The right or lien of the bank on the stock of its debtors is not a specific lien, or general lien for any specific debt, but for debts in general. If, therefore, the note of Schaeffer, indorsed by John Kuhns, had been protested, and paid by John Kuhns, voluntarily, for his own credit, or by legal process, he could not have claimed the stock by substitution, but the bank would retain their lien thereon for any other debt due by Schaeffer, although subsequent to John Kuhns's liability.

The opinion of the Court was delivered by

GIBSON, C. J.—The principle, that a surety is entitled to the benefit of all the creditor's securities, is of such universal application, that it would require strong evidence of legislative intention to make the present case an exception to it. The argument against its application is, that the lien, unlike that of the judgment sometimes given to the bank, and necessarily attached to the particular debt to protect indorsers, is created for the exclusive protection of the bank itself,

II.—S

[Kuhns v. The Westmoreland Bank.]

which may therefore apply it at pleasure while it has an interest of its own to subserve, without regard to the interest of a surety or any one else.   As regards a single transaction, the lien is undoubtedly for the benefit of the bank in the first place, for the surety is entitled but to the resulting benefit of it after the bank has been satisfied ; and this can on no principle be denied him where there are no conflicting interests in the bank, or in subsequent indorsers.   But can the lien be applied to subsequent and distinct transactions at the expense of a surety who became bound on the faith of it ?   The bank could certainly not apply it to his prejudice with a view to favour a subsequent surety, between whom and the earlier one the maxim *prior in tempore potior in jure* would prevail ; and if not in favour of a subsequent surety standing in the place of the bank, and clothed with its rights, it is not easy to understand how the bank may do it to favour itself.   There is nothing special in the clause creating the lien, which merely declares, that "no stockholder indebted to the bank shall make a transfer or receive a dividend until such debt is discharged, or security to the satisfaction of the directors is given for the same."   The language of it is indeed applicable to the bank and its directors specifically, but whether in a fiduciary character or a beneficiary one, is not said ; and it is worthy of remark, that the letter · is applicable but to a single transaction.   It would be unconscionable to shift a security on the credit of which a surety had consented to be bound.   It may be said, that the right to shift it to a new demand being established and known at the first transaction, the surety would become bound with his eyes open ; at least he could not complain if it were an implied condition that a fresh loan might be made on the credit of the same security.   That may be so ; yet it would make the situation of the surety much more precarious than it will be under the construction now to be established, and consequently decrease the facilities of the bank itself in the extension of its business.   Let the first loan create a fixed resulting interest in the lien of the bank, and no man will fail of an indorser to the amount of his stock, because the loan will be essentially on the credit of the stock ; but let the lien once be made a movable security, to be shifted, at the pleasure of the bank, to such of its debts as may be thought to need it, and even stockholders may be unable to obtain an accommodation by reason of inability to comply with the ordinary requisitions.   The bank itself will be a gainer by the rule, because there will be an increase of its business without a correspondent increase of risk ; for, like the indorser, it will know what it has to trust to, and reject all propositions for further loans which are not backed by names of indisputable credit.   To say the least, it will not be prejudiced ; for it will have the benefit of the stock to the amount of its value, and it was never intended to cover more ; so that it will be better for all parties, that the indorser know exactly the footing on which he stands at the moment of pledging his responsibility, than that the means of his eventual reimbursement be left the sport of contingencies.   Indeed, the in-

[Kuhns v. The Westmoreland Bank.]

ducement which a fresh loan on a fresh pledge of the same security, would hold out to the drawer to violate his faith to the original indorser, could scarce be reconciled to honesty or good morals; it would implicate the bank in at least a connivance at fraud. In the case at bar then, the bank had at one time the means of satisfaction in its hands, or rather it yet has a fund in its hands, which in equity belongs to the defendants, who are but sureties; and they therefore cannot be called upon.

Judgment reversed.