## Commercial National Bank *versus* Henninger.

1. Where a bank is the holder of a note payable at the banking house, and upon its maturity the maker has a cash deposit in said bank exceeding the amount of the note, which deposit is not specially applicable to a particular purpose, the bank is bound to charge up the amount of the note against the deposit. In such case the note is in effect a draft on the bank in favor of the holder, and in discharge of the indorser.

2. If, in such case, the bank does not charge up the note against the maker's deposit, but allows the note to go to protest, the bank cannot recover in a suit against the indorser.

3. A. executed two promissory notes made payable to the order of B. at a bank of which A. was cashier. B. indorsed the notes, and had them discounted at the said bank. A. refused to pay at maturity, and the notes were protested. In an action by the bank on B.'s indorsement:

    *Held*, that evidence offered on behalf of the defendant to show an agreement between A. and B. that B.'s indorsement should impose upon him no obligation to pay, and that the bank was protected from loss through this agreement by stock in the bank owned by A., and by his bond as cashier, is irrelevant and inadmissible.

    *Held further*, that A.'s account with the bank is admissible in evidence, on behalf of the defendant, to show a balance in A.'s favor, on the day of the maturity of the notes, sufficient to have paid them.

4. People's Bank of Wilkesbarre *v.* Legrand, 7 Out., 309, distinguished.

5. The erroneous admission of irrelevant testimony which, however, was harmless, is not ground for reversal, upon writ of error.

March 3, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Common Pleas of *Berks county:* Of January Term, 1884, No. 34.

Assumpsit, by the Commercial National Bank of Reading, Pa., against Charles Henninger, upon two promissory notes, payable at said bank, made by B. F. Young to the order of the defendant, and by him indorsed. B. F. Young was the cashier of the bank plaintiff, which had discounted the notes.

Upon the trial, before HAGENMAN, P. J., the following facts appeared: Charles Henninger, the defendant, sold to B. F. Young certain shares of stock in the Pennsylvania Graphite Mining Co., and received therefor his three promissory notes made payable at the Commercial National Bank of Reading, of which Young was the cashier, at three, six, and nine months after date, respectively. They were indorsed by Henninger and discounted by the said bank. Young, the maker, alleging that Henninger had defrauded him in the sale of the Graphite stock, resolved not to pay the said notes, and at the

time of the maturity of the second, handed it and the first, which he had renewed, to a notary, who made demand at the bank for payment. Young, the maker, as cashier of the bank, answered that the notes had not been provided for, whereupon they were protested, and notice thereof given to Henninger. He paid the third note when it matured, but refused to pay the first and second, and the bank brought this suit to charge him as indorser.

Defendant offered to prove an agreement by Young, as cashier, at the time of the giving of the notes, that Henninger's indorsement should impose upon him no obligation to pay, but should operate merely as a transfer of the notes, and further to show that if this transaction between Young and Henninger was unauthorized by the bank, the latter was protected from loss by shares of the capital stock of the bank owned by Young, and by his bond as cashier. All of which was objected to by the plaintiff as irrelevant. Objections overruled; exception. (First, second and third assignments of error.)

Defendant also offered to prove a custom among the Reading banks to charge notes made payable at the bank to the account of the maker, without any special direction from the maker so to do. Objected to by plaintiff as irrelevant. Objection overruled. Exception. (Fifth and sixth assignments of error.)

Defendant further offered in evidence Young's account with the plaintiff bank on February 28, 1882, to show that, at the time of the maturity of the notes, there were funds on deposit to his credit sufficient to have paid the same. Objected to by plaintiff as irrelevant. Objection overruled. Exception. (Fourth assignment of error.)

Mr. Young testified that the sum deposited to his credit at the time of the maturity of the notes had been raised by the sale of certain securities for the purpose of paying notes other than the ones in suit and subsequently maturing, and the said balance was actually applied to the payment of such other and subsequently maturing notes. There was no other evidence upon this point.

The plaintiff presented, inter alia, the following points:

1. A bank is not bound, when a note owned by it and made payable at its banking house becomes due, to appropriate moneys of the maker on deposit with it to the payment of the note. The indorser has no right to ask that the bank shall do so.

Answer. The point raises the leading question on which the case turns. We answer and charge you, that if Mr. Young had a deposit in bank sufficient to pay these notes on

9 OUTERBRIDGE—32.

the day they became due, and there were no circumstances shown in the case that would forbid the bank from so doing, the bank was obliged to charge up these notes against Mr. Young's deposit. Especially was the bank required to do so if the jury find that there was some understanding between the cashier and the president that the defendant would not be called upon to pay these notes, and such credit would be no injury to the bank. (Eighth assignment of error.)

2. If the jury believe that B. F. Young made the deposit which composed the balance in bank at the time of the maturity of the notes in suit for the purpose of paying notes other than the ones in suit, he had a right to appropriate said balance to the payment of such other notes; and the defendant was not released from his liability as indorser of the notes in suit.

Answer. If the jury believe that Mr. Young made a deposit with the specific agreement with the bank at the time it was made, that the money so deposited was to be used for other notes, then the defendant would not be released from his liability. But the jury will carefully consider the evidence. The deposit was credited on Mr. Young's general account without any entry that it was for a special purpose; and the only evidence of any special purpose is the testimony of Mr. Young, who was the depositor and cashier. He does not say that he ever notified any other officer of the bank of the disposition he intended to make of this deposit. And so far as the evidence goes, it seems to have been an understanding he had with himself. You will ascertain what the fact really was. In general, a bank has no right to protect subsequently maturing paper to the prejudice of the indorsers of prior maturing notes. (Ninth assignment of error.)

Verdict and judgment for the defendant, whereupon the plaintiff took this writ of error, assigning for error, inter alia, the admission of the testimony objected to, and the answers of the court to the points above set forth.

*Cyrus G. Derr* (*D. N. Schaeffer* with him), for the plaintiff in error.—Where a note is made payable at a particular bank, the mere fact of the maker having funds in bank at the time of maturity is not a payment of the note. If, however, the bank is the owner of the note, it *may* charge the same against the maker's account and so pay it, but it is not bound to do so in the interest of the indorser: Bank of U. S. *v.* Carneal, 2 Peters, 543; Woodbridge *v.* Brigham, 12 Mass., 405; People's Bank of Wilkesbarre *v.* Legrand, 7 Out., 309; Strong *v.* Foster, 84 E. C. L. R., *224; National Bank *v.* Peck, 127 Mass., 302. When a customer makes a deposit in a bank, he

has a right to direct its appropriation. A "specific agreement" with the bank for that purpose is not necessary; a mere direction is sufficient: West Branch Bank v. Moorehead, 5 W. & S., 542.

*Jeff. Snyder* (*George F. Baer* with him), for the defendant in error.—Where a bank, at which a note is made payable, becomes the owner of the note, and on the day of maturity the maker has funds on deposit sufficient to pay it, the indorser is discharged if the bank neglect or refuse to appropriate the maker's deposit to the payment of the note: Daniel's Negotiable Instruments, vol. 1, § 657; Kuhns v. Westmoreland Bank, 2 Watts, 136; Ramsey v. Westmoreland Bank, 2 P. & W., 204; Sitgreaves v. Bank, 13 Wright, 364; Fegley v. McDonald, 8 Norris, 130; Ætna Nat. Bank v. Fourth Nat. Bank, 46 N. Y., 88; Sloan v. Union Banking Co., 17 Smith, 472; Morse on Banks and Banking, p. 47, 2d ed.; Byles on Bills, *151; Mandeville v. Bank, 9 Cranch, 9; Griffin v. Rice, 1 Hilt. (N. Y.), 184; Wood v. Merchants' Sav., etc., 41 Ill., 267. The bank must agree to hold money deposited therein for a specific purpose, in order to make the deposit special: Bank v. Speight, 47 N. Y., 668.

Mr. Justice PAXSON delivered the opinion of the court, April 14, 1884.

The fourth and eighth assignments raise the prominent questions of this case. The fourth alleges error in admitting in evidence the account of Mr. Young with the bank on February 28, 1882, for the purpose of showing that there were funds on deposit to his credit sufficient to have paid the notes in controversy; while the eighth alleges the court erred in instructing the jury in answer to the plaintiff's first point: " That if Mr. Young had a deposit in bank sufficient to pay these notes on the day they became due, and there were no circumstances shown in the case that would forbid the bank from so doing, the bank was obliged to charge up these notes against Mr. Young's deposit. Especially was the bank required to do so if the jury find that there was some understanding between the cashier and the president, that the defendant would not be called upon to pay these notes, and such credit would be no injury to the bank."

The defendant was the indorser of the notes in suit. The maker was B. F. Young, who was also the cashier of the bank. The notes had been discounted by the bank, and were payable there. On the day they matured, at the close of banking hours, there was on deposit to the credit of Mr. Young, a balance sufficient to meet the notes. Instead of charging up

the notes against the deposit, the cashier handed them to a notary for protest. · The object of this was to hold the indorser, and compel him to proceed against the maker in order to let in a defence which the maker could not set up against the bank. The defendant contends that the failure of the bank to charge up the notes against Mr. Young's deposit relieved him as indorser.

That there were no circumstances in the case to prevent the bank from applying the deposit to the notes has been found by the jury. There is no doubt as to the right of a depositor to control his deposit up to the point when the rights of others attach. He may draw it out by his check; he may apply it to a particular purpose by making it a special deposit, or by specific directions communicated to the bank. None of these things is found in the case. The mere mental intention of the depositor, not communicated to the bank, is of no importance. While the right of the bank to charge the notes against the deposit is not disputed, it was at the same time contended that it was under no duty to do so, and that its failure to make such application did not discharge the indorser.

It is to be observed that the bank was the owner of the notes, and not a mere collecting agent. The difference is obvious. The position of the bank was this: It was a creditor of Mr. Young to the amount of the notes discounted; it was the debtor of Mr. Young to the amount of his deposit, and to that extent was in law bound to honor his checks or drafts; it held the defendant as security on the notes by reason of his indorsement thereof; the deposit exceeded the 'notes, and it had the undoubted right at the close of banking hours on the 28th of August, to charge the notes against the deposit. Was it bound to do so as between the bank and the indorser?

: In order to discuss this question intelligently we must not lose sight of the peculiar character of a bank deposit. The money deposited does not, as is popularly assumed, continue to be the property of the depositor. It becomes the money of the bank the moment it is deposited. The depositor becomes the creditor of the bank, and as before observed, the bank is his debtor, and is in law bound to honor his drafts to the extent of his deposit: Foley *v.* Hill, 1 Phillips, 399; Bank of Republic *v.* Millard, 10 Wallace, 152; Carr *v.* National Security Bank, 107 Mass., 45. When the depositor becomes indebted to the bank on one or more accounts, and such debts are due and payable, the bank has the right to apply any deposit he may have to their payment. This is by virtue of the right of set-off. Where a general deposit is made by one already indebted to the bank, the latter may appropriate such deposit to the payment of such indebtedness. This results from the

general doctrine of the application or appropriation of payments. And it may be safely asserted, that as a general rule, the former may waive the right to make such application, and allow the depositor to draw out his balance. Where, however, the rights of third parties intervene, the case is sometimes different. The distinction between the liability of a bank to a customer and to a third party is thus defined in Morse on Banks and Banking at page 47 (2d ed.): "A bank holding a note of a depositor, is under no obligation to appropriate a sum sufficient to meet it from funds on deposit immediately upon its maturity, or indeed at any other particular time; they may let the account run on and take the chance that they will not lose in the end. . . . . . But as towards third parties, the obligation upon the bank is different, and it has been decisively and properly held that the neglect of the bank to make such an appropriation of the principal debtor's funds would discharge the indorsers and sureties."

The rule is well settled that "when a creditor has in his hands the means of paying his debt out of the property of his principal debtor, and does not use it, but gives it up, the surety is discharged. It need not be actually in the hands of the creditor; if it be within his control, so that by the exercise of reasonable diligence he may have realized his pay out of it, yet voluntarily and by supine negligence relinquished it, the surety is discharged:" Fegley v. McDonald, 8 Norris, 128, citing Commonwealth v. Vanderslice, 8 S. & R., 452; Everly v. Rice, 8 Harris, 297; Boschert v. Brown, 22 P. F. S., 372, and other cases.

This familiar rule applies to banks as well as other creditors. It was so held in Kuhns v. The Westmoreland Bank, 2 Watts, 136, where it was ruled: "The lien which a bank has, by virtue of the seventh section of the Act of 21st March, 1814, upon the stock of its debtor, results for the benefit of the surety of such debtor; and such is that resulting interest that the surety cannot be deprived of it. Hence, if the bank permit the stock of such debtor to be sold, and its proceeds applied to discharge a debt due to the bank by the same debtor which originated by a note of subsequent date, the surety in the first transaction will be thereby discharged."

Ramsey v. Westmoreland Bank, 2 P. & W., 203, was a suit against a surety. The facts and the law of the case are sufficiently explained in the following extract from the opinion of the court: "The note on which the suit was instituted had been drawn by William Johnson and indorsed by John Ramsey; he was then a mere surety, and as such entitled to be favored in the law. The evidence he offered was to prove, and would have proved, that a large balance arising on the sale of

the real estate of William Johnson, was in the hands of the sheriff, which was subject and liable to the judgment of the bank, and would have been obtained if due diligence had been used.  The case then, if proved as offered by the plaintiff in error to the court below, would have come within the principle stated by the present Chief Justice in Bellas *v.* Miller's Administrators, 8 S. & R., 457, 'that no rule in equity was clearer than that where a creditor has the means of satisfaction in his hands, and chooses not to retain them, but suffers them to pass into the hands of the principal, the surety can never be called upon.'   Here, to be sure, the bank had not the balance actually in its hands, nor did they actually assent to its passing into the hands of Johnson, but they might by using due diligence, and by doing their duty to the surety, have obtained it and thus have had satisfaction *pro tanto* on their judgment from the proceeds of the real estate of the real debtor, and it was their duty to have done this.   The money thus obtained from the sale of the real estate of Johnson, on which the bank's judgment was a lien, was actually brought into court.   Johnson could not take it out of court, but the bank could have done so, and if they did not, they must lose it for having had the means of payment in their power they could not pass them by and recover from a surety."

Ramsey *v.* The Westmoreland Bank was approved in the subsequent case of Sitgreaves *v.* The Bank, 13 Wright, 359; and the same principle has been recognized and followed in numerous later cases, including Fegley *v.* McDonald, *supra.* Is it applicable to the case in hand?   Of this we are in no doubt.   The bank being indebted to Young, when his notes matured, in an amount exceeding the notes, the latter had the clear right to set off so much of his deposit as was necessary to meet the notes.   The defendant, as surety, was entitled to avail himself of Young's right.   It may be illustrated thus: If I am the holder of A.'s note, indorsed by C., and when the note matures I am indebted to A. in an amount equal to or exceeding the note, can I have the note protested and hold C. as indorser?   It is true, A.'s note is not technically paid, but the right to set-off exists, and surely C. may show, in relief of his obligation as surety, that I am really the debtor, instead of the creditor of A.   If this is so between individuals, why is it not so between a bank and individuals?

Further, the note in controversy was payable at the bank. An acceptance or promissory note thus payable is, if the party is in funds, that is, has the amount to his credit, equivalent to a check; and it is in effect an order or draft on the banker in favor of the holder for the amount of the note or acceptance: Ætna National Bank *v.* Fourth National Bank, 46

N. Y., 88.   I do not understand this principle to be disputed.
The note, therefore, was a draft on the bank against the
deposit of the maker.   It was the equivalent to a peremptory
order on the bank to pay, or, to speak more accurately, to
charge the notes against the deposit.   And the jury have
found that there was no direction on the part of the depositor
to interfere with this.   It must be conceded that if the deposit
had been special, or, if previous to the maturity of the note
any arrangement had been made between the depositor and
the bank, by which the bank had been forbidden to apply the
money in its hands to the payment of these notes, the indorser
would not be discharged.   As was held in Bank v. Speight,
47 N. Y., 668 : " If before the maturity of paper held by a
bank against a depositor an arrangement is made by which
the bank agrees to hold the deposit for a specific purpose, and
not to charge the note against it, the bank may be regarded
as a trustee, and the deposit special.   In such a case, in the
absence of fraud or collusion, an indorser upon such paper
has no right to require the application of the deposit towards
the payment of the paper upon its maturity."

Bank of Wilkesbarre v. Legrand, 7 Out., 309, is not in
conflict with this view.   The precise question we are con-
sidering was not decided in that case.   There Lowenstein
had not sufficient funds in the bank to pay the note at the
time it matured.   Subsequently he made a special arrange-
ment by which he was to continue to do business with the
bank, and it was alleged the time of payment had been
extended.   At several times after this he had sufficient
money on deposit to pay the note.   The court below subse-
quently entered judgment against the bank upon the ground,
principally, that the indorser was discharged by the extension
of the time, which judgment was subsequently reversed by
this court.   It needs but a cursory examination of that case
to see that it does not rule this.

Nor do the other cases cited by the plaintiff sustain his con-
tention.   In Bank of U. S. v. Carneal, 2 Peters, 543, the
question was whether the indorser was discharged by a failure
to make demand upon the maker.   The note was payable at
the bank, the demand was made there, and it was said by
Justice STORY: " Where a note is payable at a bank . . . . .
it is his (the maker's) duty to be at the bank within the
usual hours of business to pay the same."

Strong v. Foster, 84 English C. L. R., 201, was not the case
of an indorser, but of one of the makers of a joint and several
promissory note who claimed to be a surety.   It was at least
doubtful whether he was a surety ; his position on the note
did not make him so, and there were no funds to the credit of

either of the makers when the note matured. On the contrary, the balance was against them. The court held, under the circumstances of the case, that the failure of the bank to apply a subsequent deposit to the payment of the note did not discharge the defendant, and intimated the opinion it would not have discharged him even had he been a surety.

In the National Mahaiwe Bank *v.* Peck, 127 Mass., 302, it was ruled that: "Where, by express agreement, or by a course of dealing between a bank and one of its depositors, a certain note of the depositor is not included in the general account between them, any balance due from him to the bank when the note becomes payable is not to be applied in satisfaction of the note, even for the benefit of a surety thereon, except at the election of the bank." The bank had "discounted for B. a note signed by him as treasurer of a town, and indorsed by P., the proceeds of which were to be used by B. in his official capacity. Neither the note nor its proceeds were made part of B.'s personal account with the bank. At the time that note matured the bank held the personal note of B., which would mature the next day, and which exceeded the amount then standing to the credit of B.'s personal account. As soon as the personal note matured the president of the bank directed the cashier to apply the balance of B.'s account to the personal note. Three days after P. presented a check to the bank signed by B., in which he directed the balance of his account to be paid on account of his official note. The cashier refused so to apply it because of the direction he had received. *Held*, in an action by the bank against P. on the official note, that neither he nor B. could insist that the amount standing to B.'s credit at the maturity of the note should be applied to the payment of the note in suit." It will be noticed that the official note did not enter into B.'s personal account, and that before B.'s check had been presented at the bank the latter had applied his personal deposit in part payment of his personal note, which had matured. Its right to do so is apparent.

As the principles above indicated control this case, a discussion of the remaining assignments is not necessary. To avoid misapprehension it is proper to say, however, that the offers of testimony embraced in the first three assignments of error were irrelevant, and should have been excluded. The bank was a holder for value, and the facts set forth in the said offers did not constitute a defence. But the admission of the evidence under these offers did no harm, and it is settled law that for immaterial errors this court will not reverse. Nor is it essential to criticise the admission of the testimony in relation to the custom of the Reading banks to

charge a note made payable at the bank against a deposit standing to the credit of a maker. Such a mode of dealing could hardly have the force of a custom considered in its legal sense. But as a course of commercial dealing it was perhaps competent, and it, at most, merely showed that the banks did what they had a conceded right to do aside from any such custom or usage.

Judgment affirmed.