17134

CITY LUMBER COMPANY, Respondent, v. NATIONAL
SURETY CORPORATION, Appellant
(92 S. E. (2d) 128)

*J. Perrin Anderson, Esq.,* of Greenwood, *for Appellant,*

*Messrs. Mays, Featherstone & Bradford,* of Greenwood,
*for Respondent,*

March 19, 1956.

OXNER, Justice.

This is an action against the surety on a bond for the performance of a contract by Southern Construction Company, Inc., of Augusta, Georgia, to construct a housing project at Abbeville, South Carolina. Under the terms of the bond, the contractor and its surety were obligated to pay for all labor, materials and equipment performed and furnished on the job.

Respondent, City Lumber Company, alleged in its complaint that it sold to one W. C. Drake, a subcontractor, a large amount of paint used on the project, and that there was a balance due of $2,251.74, which both Drake and the prime contractor, after demand, had refused to pay. Judgment was sought against the surety for said amount. The surety claimed that respondent had been paid by the Southern Construction Company, Inc. for the paint purchased by Drake, and further asserted the defenses of waiver and estoppel. The trial resulted in a verdict for respondent in the amount of $2,251.74. The sole question presented on this appeal is whether the trial Judge erred in refusing the surety's motion that recovery be limited to the sum of $234-.38, for which liability was admitted.

The Southern Construction Company, Inc. sublet the painting work to W. C. Drake, a paint contractor, for a lump sum price. Drake commenced purchasing paint from respondent in October, 1951 and continued to do so on open account until February 21, 1952. During this interim his purchases amounted to $3,251.74. Drake paid on this account $500.00 on January 1, 1952 and $500.00 on February 18, 1952, leaving a balance unpaid of $2,251.74. On February 21, 1952, Drake, due to some misunderstanding or controversy with Southern Construction Company, quit the job

and never returned. This action was instituted against the surety on October 16, 1952.

Four or five days prior to the last payment of $500.00 on February 18, 1952, Drake, accompanied by James M. Mann, manager of the City Lumber Company, approached J. T. Bryan, a vice-president of Southern Construction Company, Inc., supervising this construction job, and urged Bryan to make a payment to Drake on his contract in order that he might be able to make payments on his labor and paint accounts. Bryan did not give them any encouragement, but said that as soon as he got back to the home office in Augusta, he would see what could be done about making a payment. After returning to Abbeville from Augusta, Bryan on February 15, 1952 delivered to Drake's foreman a check of Southern Construction Company payable to the joint order of W. C. Drake and City Lumber Company for $3,500.00, earmarked "advance on contract." On the night of the same day, Drake, who lived in Greenwood, called Mann, who lived in Abbeville, on the telephone and told him about the check and asked Mann's permission to endorse the name of City Lumber Company on the back of the check in order that he might collect it and pay his pressing labor bills, and promised to make a substantial payment on the account of City Lumber Company. Mann agreed to this request and several days later received from Drake a check for $500.00 as a payment on the paint account. .

At the time of this check transaction, there was still much work to be done by Drake before completing his contract. Drake continued purchasing paint for the job until he quit on February 21, 1952. The amount purchased between February 15 and February 21, 1952 amounted to $234.38. On the trial of the case, appellant admitted owing this amount but vigorously denied liability on the paint bills incurred prior to the negotiation of said check, asserting payment, waiver and estoppel.

Drake was not offered as a witness on the trial of the case. Only Mann and Bryan testified. There is no material

difference between them as to what occurred when Bryan was approached on the job by Mann and Drake requesting that the Southern Construction Company make a payment or advancement to Drake on account. Mann's version of this conversation was as follows: "Just prior to Drake receiving this check I went over to talk with Mr. Bryan. Mr. Drake was with me and I solicited a little money, told him we definitely needed payment on the account, and at that time he told me—I don't know exactly what was involved—he said it might be some time before Drake would receive another payment, before he could pay us. Other words, he didn't give me any encouragement for any immediate payment on the account." On cross-examination, he testified:

"Q. So in letting Mr. Drake take off this $3,500.00 check, with authorizing him to have City Lumber Company's name endorsed on it without making any demand from him that he pay you a certain amount, you were just taking a pretty big risk there, weren't you? A. What do you mean by a demand?

"Q. You said you didn't demand any specific amount. A. I requested that he make a substantial amount. We understood that verbally. The conversation was over the phone and he said he'd make a substantial payment on it."

Mann admitted that he probably told Bryan the amount Drake owed his firm, but said that he was never given any notice that he was to collect respondent's account from the check, and claimed that had he known he was expected to do so, he would not have authorized the endorsement of the check.

Bryan was quite positive that in the conversation he had with Drake and Mann, the latter told him that the amount owing by Drake was around $2,500.00. It further appears from Bryan's testimony that prior to the issuance of the $3,500.00 check, the Southern Construction Company had issued to Drake on account eight checks totaling $5,367.38, each of which had been payable directly to Drake. Bryan estimated that in giving the $3,500.00 check, the Southern

Construction Company was paying on the paint job approximately $900.00 more than was due Drake at that time.

We think the action of respondent in endorsing the check without collecting the past due account of Drake, which then amounted to $2,517.36, released the Southern Construction Company and its surety from liability for such indebtedness. It is true that the check for $3,500.00 represented approximately $1,000.00 more than the amount Drake then owed to respondent and that the Southern Construction Company did not expressly request respondent to collect from the check the unpaid paint bills. But the only reasonable inference warranted by the circumstances is that respondent was made a co-payee to enable it to collect whatever amount might be owing to it by Drake. If the Southern Construction Company had intended to vest in Drake the right to the unrestricted use of the proceeds of the check, Drake would have been made the sole payee, as was done when checks were previously issued to him.

Several days prior to the issuance of the check, respondent's manager, along with Drake, approached the vice-president of Southern Construction Company for the purpose of soliciting "a little money," stating "we definitely need payment on the account." Perhaps not knowing the exact amount owed by Drake to respondent and realizing that Drake needed funds for labor, the check was issued for $3,500.00 payable to the joint order of the parties, a practice frequently followed in the business world when several persons are interested in the amount to be paid. As an experienced business man, respondent's manager was bound to have known, without being specifically so advised, that he was expected to collect respondent's account from the proceeds of the check. Instead of doing so, he authorized Drake to endorse respondent's name on the back and use all of the proceeds except $500.00. He may have done this through a desire to continue selling paint to Drake, thinking that the latter would continue on the job and pay respondent's indebtedness from subsequent payments made by the Southern

Construction Company, but such considerations cannot be allowed to penalize the prime contractor and its surety.

The $3,500.00 check was given for the purpose of satisfying claims which the prime contractor and its surety were obligated under the terms of the bond to pay. The source of the money was known to the respondent. The surety was equitably entitled to have the check applied to the discharge of the debts for which it was bound, but this was not done because of the negligence of respondent in empowering Drake to use the funds for any purpose which he desired. This is not a case of non-action on the part of the creditor, but positive and affirmative action injuriously affecting the surety.

It is true that Drake may not have consented to the payment from the proceeds of the check of all the indebtedness owing by him to respondent and that if respondent had insisted that this be done the check may not have been negotiated, but if the check had not been accepted by the parties for the purpose for which it was obviously issued, the prime contractor could have taken other steps to protect its liability.

No case has been cited, and we have found none in our own research, involving the precise question before us, but we think applicable to some extent is the general rule that where the creditor has within his control funds of the principal debtor which may properly be applied toward the payment of the obligation, but fails to do so, the surety is discharged. See Annotation in 115 Amer. State Reports, beginning on page 95; 50 Am. Jur., Suretyship, Sec. 116. In *Commercial National Bank v. Henninger,* 105 Pa. 496, the court said: "The rule is well settled that 'when a creditor has in his hands the means of paying his debt out of the property of his principal debtor, and does not use it, but gives it up, the surety is discharged. It need not be actually in the hands of the creditor; if it be within his control, so that by the exercise of reasonable diligence he may have realized his pay out of it, yet voluntarily and by supine negligence relinquished it, the surety is discharged.' "

Applicable to the facts of this case is the further well established principle that where one of two innocent parties must suffer a loss, it must be borne by that one of them, who, by his conduct, has rendered the injury possible. 19 Am. Jur., Estoppel, Sec. 67; also see *Land v. Reese,* 136 S. C. 267, 134 S. E. 252, 253; *McFaddin v. Bland,* 147 S. C. 27, 144 S. E. 592; *Mortgage & Acceptance Corp. v. Stewart,* 142 S. C. 375, 140 S. E. 804.

We have carefully considered the case of *In re McElmurray,* D. C., 47 F. Supp. 15, upon which respondent strongly relies. It is not inconsistent with the views hereinabove expressed. The question involved there was one of payment, a ground upon which we have not rested this decision; nor were the rights of the maker of the check involved in that controversy.

The judgment of the court below is reversed and the case is remanded for entry of judgment against appellant in the sum of $234.38, for which liability is conceded.

TAYLOR and LEGGE, JJ., and BRUCE LITTLEJOHN, Acting Associate Justice, concur.

STUKES, Chief Justice (dissenting).

I regret that I am in disagreement with the statement in the leading opinion that the only reasonable inference which is warranted by the circumstances is that respondent was made a co-payee of the check to enable it to collect whatever amount might be owing it by Drake. The maker of the check did not even so claim in the testimony of its official.

The check was for a substantially larger amount than the indebtedness, but suppose it had been in the exact amount of the account or in a smaller amount, would respondent have been bound at its peril to require the payment of all of the proceeds of the check to it, although Drake was made a co-payee of the check and the drawer marked it "advance on contract," and delivered it to Drake? If so, why, then, a joint check and delivery of it to Drake? Drake had the contract upon which the "advance" was made, not respondent.

Respondent's manager, Mann, testified that in the interview between him, Bryan, and Drake, he did not ask for payment of the account in full, and did not expect it, but merely requested a substantial payment on the account or, as the witness expressed it again, "a little money." This was corroborated by Bryan who testified that Mann did not ask for payment in full but, quoting from Bryan's testimony, "He did not say specifically whether he was asking for one dollar or all of it, sir."

It was not unusual that Mann should interview Bryan about accounts for materials that went into the contract of Bryan's company. On that point Bryan testified as follows:

"From time to time, sir, the duration of the job, up to that time on the job, he (Mann) had mentioned to me about accounts, not only of Drake, but of some other fellows who had been purchasing stuff there. * * *"

But this was the only jointly payable check which was issued.

Mann testified that he had no notice from appellant that he was expected to collect Drake's account in full out of the check; and if he had been given such notice, he would not have authorized the endorsement of it without collection of the account in full.

To me there is significance in the fact that the check was not delivered to respondent, but to Drake. If it had been intended for payment in full of respondent's account, would it not have been sent to respondent instead of to Drake?

The decision means that it was necessary for respondent to exact full payment of its account from the check, when it had not requested and did not expect that; and the account had never been liquidated before; it was a running account and a good one, upon which only a partial payment had been made before. It would have been unnatural for respondent to require payment in full in the midst of the job, and unfair for the law to require that course in the absence of facts which do not appear from the evidence in this case.

It was a "government" contract, with a bonded contractor, which surely justified the extension of credit.

I think that the claimed negligence of respondent, whereby it is concluded that estoppel arose, was at most an issue for the jury, as were the issues of waiver and intent of the parties. There is no contention of error in the instructions to the jury, under which the issues were submitted, and I would not disturb the verdict. The jury may reasonably have concluded that the maker of the check was negligent or failed in its duty in not notifying respondent that it was required that the account be collected in full out of the check, although such a demand had not been made by respondent, or expected by it.

Nor do I agree that the principle of "two innocent parties" is applicable. None of the authorities which are cited to the point in the leading opinion was concerned with a performance bond or with other facts parallel to those in this case. Drake defaulted and abandoned his subcontract. It was the payment of his obligations that appellant guaranteed.