12494

McFADDIN *ET AL.* v. BLAND *ET AL.*

(144 S. E., 592)

February, 1927.

*Messrs. R. H. Welch* and *D. W. Robinson,* for appellant,

*Messrs. H. C. Haynsworth* and *L. D. Jennings,* for Mary McFaddin and T. H. McFaddin,

*Messrs. Harby, Nash & Hodges,* for respondents,

August 17, 1928.

The opinion of the Court was delivered by MR. ACTING JUSTICE J. WM. THURMOND.

This action was commenced July 25, 1924, by T. H. Mc-Faddin and Mary B. McFaddin against R. J. Bland, R. O. Purdy, S. Oliver O'Bryan, and L. S. Carson, alleging that a mortgage given by the plaintiffs to R. J. Bland, and by him assigned to L. S. Carson, had been fully paid and satisfied, and that the defendants failed and refused to cancel the same of record. The action prayed for judgment against the defendants for the penalties provided by the statutes for failure and refusal to enter satisfaction on the records of the mortgage within three months from the demand therefor.

The defendants by their answers joined issue with the plaintiffs, and the defendant, L. S. Carson, then the owner of the McFaddin mortgage, prayed for a foreclosure of the mortgage. On the trial of said case, involving the issues between the plaintiffs and said defendants, on December 9, 1925, the defendants prevailed in the action; but an order was made by his Honor, W. H. Townsend, who heard that branch of the case, referring the cause to E. C. Haynsworth, Master of Sumter County, with authority to make additional parties and to take testimony and report the same to the Court on the issues raised.

The plaintiffs then filed an amended complaint, and the Federal Land Bank of Columbia, United States Fidelity & Guaranty Company, C. P. Gable, and Black River Cypress Company, were made new parties to the action, and the Federal Land Bank of Columbia filed its answer, making the issues hereinafter considered. The subsequent litigation has been between the plaintiffs and the defendant, the Federal Land Bank of Columbia.

The attorneys for all of the respective parties to the action agreed on a statement of facts, embodied in nine paragraphs, including Exhibits A, B, C, D, E, F, and G, and Exhibit L to Exhibit L-16, and the agreement of facts follows:

"AGREED STATEMENT OF FACTS

"Executed by attorneys for all parties January 6, 1927.

"In addition to the admissions of fact contained in the pleadings in this cause, the letters and correspondence, and other written documents hereinafter referred to, the following facts have been agreed upon by the parties to this cause for submission to the Court, as a basis for the adjudication of the above-entitled cause:

"(1) It is admitted that Mary B. McFaddin and T. H. McFaddin executed a bond and mortgage unto R. J. Bland, which was subsequently assigned to L. S. Carson, conditioned for the payment of $2,500.00, dated September 15, 1915, copies of which are hereto attached as Exhibits A and

B, bearing interest at the rate of 8 per cent. per annum until paid, with interest on interest at the same rate, covering two tracts of land described therein, containing 60 and 40 acres, respectively, and that the same was recorded on the 15th day of October, 1915, in Book T-4, p. 362, in the office of the Clerk of the Court of Common Pleas for Clarendon County, which is the property of Mary B. McFaddin, and that said mortgage is a first lien on the land therein described.

"(2) It is further admitted that on or about the 30th day of January, 1920, the plaintiff, Mary B. McFaddin, made application to the defendant, the Federal Land Bank of Columbia, for a loan of $1,500.00, copy of which application is hereto attached as Exhibit C, and that said application contained a statement that it was to liquidate prior indebtedness, and that abstract of title furnished the Federal Land Bank of Columbia by S. Oliver O'Bryan did contain notice of the said Carson mortgage as an open lien upon said land.

"(3) That the Federal Land Bank of Columbia furnished to the applicant a list of attorneys for Clarendon County whose abstracts would be accepted by said bank, and that on said list was the name of S. Oliver O'Bryan and Purdy & O'Bryan.

"(4) That an abstract was prepared by said O'Bryan, which was approved by said bank, and which showed the Carson mortgage as an open lien upon the land described therein, part of which land, to wit, 78 acres, were offered the Federal Land Bank as security for a loan of $1,500.00, which is described in the mortgage to the Federal Land Bank, a copy of which abstract is attached hereto as Exhibit D. That said mortgage and note were prepared by the Federal Land Bank of Columbia, and forwarded to S. Oliver O'Bryan for execution by the said Mrs. McFaddin, and that the said Mrs. McFaddin was instructed by said bank to go to the office of S. Oliver O'Bryan and execute the same, which she did, and that S. Oliver O'Bryan was instructed by said bank to have said mortgage recorded and returned to said bank, together with the note, which he did.

"(5) On September 7, 1920, said Federal Land Bank issued a check for the sum of $1,412.50 on the Treasurer of the United States, payable to L. C. Tisdale, secretary-treasurer, and Mrs. Mary B. McFaddin, borrower. This was the amount of the loan, less the deduction of $75.00 for stock and certain small incidental charges for appraisal of land, etc., including one-fourth of 1 per cent. for premium on an indemnity bond given to Federal Land Bank of Columbia, by United States Fidelity & Guaranty Company, of Baltimore, and others, for the purposes set forth in said bond. The note and mortgage bore interest at the rate of 5½ per cent. Copy of said bond is hereto attached as Exhibit E, hereby referred to, and made a part of this stipulation.

"(6) That said check, copy of which is hereto attached as Exhibit F, was, according to the practice and custom of said bank, forwarded to S. Oliver O'Bryan, said check being made payable to Mary B. McFaddin and L. C. Tisdale as secretary of Black River Farm & Loan Association, with instructions as appears on Exhibit G, copy of which is hereto attached.

"(7) The parties being unable to agree as to whether or not any moneys were furnished by Mary B. McFaddin to S. Oliver O'Bryan, outside of and beyond the check of Federal Land Bank for $1,412.50, for the purpose of paying up the Carson mortgage, it is agreed that the testimony on this point shall be taken.

"(8) It is admitted that the bond and mortgage originally executed to R. J. Bland, and now known as the L. S. Carson mortgage, is a first and prior lien on the property therein described, and it is further agreed that, if any question arises as to whether said mortgage covers any of the lands referred to in the answer of the Black River Cypress Company and C. P. Gable, then such additional testimony may be introduced by the parties interested therein to determine any conflicting claims as to any part of said land.

"(9) It is further agreed that Exhibits A-G and L to L-16 are to be used as part of the evidence in the trial of this cause. * * * "

It was alleged in the complaint that the Federal Land Bank procured an indemnity bond in said indemnity company, and that Black River Cypress Company and C. P. Gable claimed some interest in the property, but those three parties were simply formal, and in the status of the case no further reference will be made to the three said parties, the indemnity company, Black River Cypress Company, and C. P. Gable.

Said agreed statement of facts, with said exhibits and the testimony of certain witnesses, were offered in evidence before the Master. It appears from the agreed statement of facts that the Federal Land Bank of Columbia, upon application for a loan by the plaintiff, Mrs. Mary B. McFaddin, furnished to her a list of attorneys, among whom was S. Oliver O'Bryan, and he made an abstract of a tract of 78 acres of land offered as security for a loan of $1,500.00, and said abstract showed a mortgage lien open on said land in favor of L. S. Carson, and the note and mortgage for said plaintiff to execute were prepared by the Federal Land Bank of Columbia, and forwarded to S. Oliver O'Bryan for execution by Mrs. McFaddin, and she was instructed by said bank to go to the office of S. Oliver O'Bryan and execute the same, and this she did, and S. Oliver O'Bryan was instructed by said bank to have mortgage recorded and returned to the bank with the note, and this he did.

On September 7, 1920, said bank issued a check for the sum of $1,412.50, payable to L. S. Tisdale, secretary-treasurer, and Mrs. Mary B. McFaddin, borrower. This was the amount of the loan, less the deduction of $75.00 for stock and incidental charges, including one-fourth of 1 per cent. for premium on indemnity bond. It will be observed that both the plaintiffs executed the Bland mortgage, but only one, Mrs. Mary B. McFaddin, executed the mortgage to the Federal Land Bank of Columbia.

Several days after the date of said check was received by O'Bryan, a payment of $800.00 was made by him on the Carson mortgage, and the facts and circumstances show by a clear preponderance of the testimony that this money was a part of that represented by said check; hence the Federal Land Bank of Columbia must be credited with that amount. The balance of money represented by said check, except the amount paid out for incidental expenses aforesaid, to wit, $612.50, was embezzled by the said O'Bryan, and this is the loss of the Federal Land Bank.

The main question to be reviewed by this Court is: Was O'Bryan the agent of the Federal Land Bank, or the agent of the plaintiffs, in disbursing that check? The Court thinks the conclusion is irresistible, under the facts in this case, that O'Bryan was the agent of the Federal Land Bank in disbursing the check, and that the plaintiff, Mrs. McFaddin, is entitled to credit for the amount embezzled by him, with interest at 8 per cent. from the date of embezzlement, until judgment entered, then 7 per cent.

There was certainly no abuse of discretion on the part of the trial Judge in refusing to allow to be rescinded the agreed statement of facts. *Jones & Parker v. Webb,* 8 S. C., 206. *Beck v. Railway Co.,* 99 S. C., 310; 83 S. E., 335. The application of Mrs. McFaddin stated that the money realized from the loan was to be used in liquidating her indebtedness. This was notice to the Federal Land Bank, when it mailed its check to O'Bryan, who was to disburse the money, that the money represented by the check was to be paid on the indebtedness of Mrs. McFaddin.

O'Bryan was one of the attorneys that the Federal Land Bank suggested to Mrs. McFaddin. She could not retain any attorney she pleased, but was restricted to a selection from a list given her by the lender. O'Bryan made the abstract, and it was approved by the Federal Land Bank. The check was made payable to her and L. C. Tisdale, secretary-

treasurer, but forwarded to O'Bryan; but the indorsement of said check by the payee, while necessary, was simply formal in that transaction, for the money was to be disbursed by O'Bryan.

So, while the Federal Land Bank and Mrs. Mary B. McFaddin were both innocent parties, Mrs. McFaddin evidently went to O'Bryan because directed to him by the Federal Land Bank, and delivered to him the check indorsed, as aforesaid, as required to do by the Federal Land Bank, and the Federal Land Bank relied on him to see that the record was clear and the loan closed, and the money applied to the indebtedness of Mrs. McFaddin. O'Bryan was required to follow the directions of the Federal Land Bank, and not the directions of the plaintiff, Mrs. Mary B. McFaddin.

Unless the facts are admitted, the question of agency is a question of fact, and the trial Judge found as a fact that O'Bryan, in the disbursement of the check, was the agent of the Federal Land Bank. We think this finding of fact is correct. See *Mayfield v. B. & A. Mortgage Co., Ltd.*, 104 S. C., 152; 88 S. E., 370. *American Mortgage Co. v. Felder*, 44 S. C., 478; 22 S. E., 598. *Land Mortgage Co. v. Gillam*, 49 S. C., 345; 26 S. E., 990; 29 S. E., 203. *Bates v. American Mortgage Co.*, 37 S. C., 88; 16 S. E., 883; 21 L. R. A., 340. *Banks v. Express Co.*, 73 S. C., 214; 53 S. E., 166. *Mitchell v. Leech*, 69 S. C., 420; 48 S. E., 290; 66 L. R. A., 723; 104 Am. St. Rep., 811. *Weathers v. Sovereign Camp*, 119 S. C., 402; 112 S. E., 44.

In *Land v. Reese et al.*, 136 S. C., 267; 134 S. E., 252, it is held:

"Where one of two innocent persons will suffer for wrongful act of third, one who was most at fault in letting it be brought about will be required to bear loss."

See *Middleton v. Cockfield*, 113 S. C., 282; 102 S. E., 328.

The Court is of opinion that the principle announced in the last two cases avails the plaintiff in this case.

The case of *Atlantic Life Insurance Co. v. Rowland* (C. C. A.), 22 F. (2d), 126, quoted in behalf of the Federal Land Bank, is not in point, as it was found as a fact in that case that the attorney was the agent of both the borrower and the lender, and the Court held that, where the equities of the parties are equal, a Court of Equity will leave them where it found them; whereas in the case under consideration it is clear that Attorney O'Bryan was agent of the Federal Land Bank, and said trust committed by it to his care made the fraud of O'Bryan possible.

The plaintiff made three exceptions to the decree of his Honor, Judge Dennis.

The first exception, to wit, that the Court erred in admitting the transcript of the testimony taken at the trial at Kingstree, should be sustained, as that was not included in the stipulation of the evidence to be considered in the trial of the issues for review; however, this error does not affect the result reached, and is harmless.

Exceptions 2 and 3 have been disposed of in considering the exceptions of the Federal Land Bank.

All six exceptions made by the appellant in this case have been carefully considered, though not *seriatim,* and there is no merit in Exceptions 1, 2, 4, and 5, and they are overruled; but Exception 3 should be sustained, and Exception 6 modified as herein stated.

The judgment of this Court is that the judgment of the lower Court be modified as herein set out, and otherwise affirmed.

Mr. Justice Blease concurs.

Mr. Justice Carter concurs in result.

Mr. Justice Cothran dissents.

ON PETITION FOR REHEARING

MESSRS. JUSTICES BLEASE and CARTER, and MR. ACTING ASSOCIATE JUSTICE J. WM. THURMOND. Rehearing denied.

MR. JUSTICE COTHRAN (dissenting) : I shall again attempt to demonstrate the fallacy of the majority opinion in this case, withdrawing the dissenting opinion heretofore filed, and submitting this as a dissenting opinion from the leading opinion of Mr. Acting Associate Justice Thurmond, and from the proposed order dismissing the petition for a rehearing.

The course of this ship has materially veered from that upon which it set sail. Originally it was an action by the plaintiffs, husband and wife, against the defendants, R. O. Purdy, R. J. Bland, and L. S. Carson, alleging that a certain note and mortgage executed by Mrs. McFaddin to R. J. Bland, and later assigned to L. S. Carson, had been paid in full by her to *Purdy & O'Bryan, as agents of R. J. Bland,* and demanding that the mortgage be canceled and judgment for the statutory penalty provided in Section 5225, Vol. 3, Code.

The defendants, other than Carson, answered, denying the right of the plaintiffs to have the mortgage canceled, and repudiating all possible liability on their part to respond to any demand of the plaintiffs. The defendant, Carson, answered, alleging the assignment of the bond and mortgage by Bland to him, and asking for foreclosure of the same.

The plaintiffs replied to the answer of Carson, denying his right to a foreclosure of his assigned mortgage. The case came on to be tried before his Honor, Judge Townsend, and a jury, at December term, 1925.

At the conclusion of the testimony his Honor directed a verdict in favor of the defendants, as he stated, "upon all the legal issues raised by the pleadings, including the issue of whether or not the mortgage described in the complaint and in the answer of the defendant, L. S. Carson, had been

paid." His Honor then signed an order which, after reciting his direction of a verdict in favor of the defendants upon the ground above stated, continued:

"This disposes of the entire case, except for the affirmative defense set up in the answer of the defendant, L. S. Carson, asking foreclosure of this mortgage. It appearing to the Court that this equitable cause of action cannot be disposed of without the presence of the Federal Land Bank, and perhaps other parties, who have not been made parties to this cause, now, on motion of Harby, Nash & Hodges, attorneys for the defendant, L. S. Carson, it is ordered that the equitable issues raised by the answer of said defendant, L. S. Carson, and the reply thereto, except such as have been foreclosed by the verdict of the jury, be, and they are hereby, referred to E. C. Haynsworth, Esq., as Special Referee, to take testimony and report his conclusions of law and findings of fact thereon, together with leave to report special matters."

From this direction of a verdict and order no appeal was taken. Subsequently the plaintiffs amended their summons and complaint, by making parties defendant the Federal Land Bank of Columbia, the United States Fidelity & Guaranty Company, C. P. Gable, and Black River Cypress Company.

It will be observed that the theory of the amended complaint is quite different from that of the original. In the original it is alleged that the mortgage had been paid in full by the plaintiffs to Purdy & O'Bryan *as the agents of Bland,* and should be canceled of record, and for the statutory penalty for not having had that done. In the amended complaint it is alleged that the payment was made to O'Bryan *as the agent of the Federal Land Bank;* that as such agent he failed to carry out the instructions of the bank in their transmission of the check for money borrowed by Mrs. McFaddin with which to pay the Bland-Carson mortgage, and that in consequence the plaintiffs have been damaged to the

extent of the amount due upon the Carson mortgage, $3,-978.98, as of March 15, 1926.

The Federal Land Bank answered the amended complaint, admitting generally the facts therein stated, but denying its liability; alleging that O'Bryan was not its agent in the transactions, and that it was not responsible for his defalcation; on the contrary, that O'Bryan was the agent of the plaintiffs, and that they had no right to call upon it for the misappropriation of the borrowed funds by him. It appears, then, that the real contest now is between the plaintiffs and the defendant, Federal Land Bank; the plaintiffs seeking to hold the bank responsible for the failure of O'Bryan to pay the amount borrowed by Mrs. McFaddin upon the Bland-Carson mortgage, as he undertook to do, at their instance, or at least permission, contrary to the explicit directions of the bank, to which the mortgagor had agreed in her application for the loan.

The case was referred to E. C. Haynsworth, Esq., Master, to hear and determine all issues of law and fact. He took the testimony of two witnesses, which does not materially affect the issues now presented, and with it reported the stipulation of counsel set forth in the opinion of Justice Thurmond.

The record for appeal does not show whether the Special Referee made a report or not, and, if not, there is no explanation why it was not made, in view of the order of his Honor, Judge Townsend, referring the issues of law and fact to him. This is not intended as a criticism of the most excellent officer, but simply as a narrative of the case. We assume that it was not deemed necessary and by common consent was waived.

The cause then came on to be heard before his Honor, Judge Dennis, on February 14, 1927, upon the stipulation of counsel, the exhibits therein referred to, the pleadings, and the evidence taken before the Special Referee. On February 19, 1927, his Honor, Judge Dennis, filed a decree

finding that in the matter of handling the check, which represented the proceeds of the loan made to Mrs. McFaddin by the Federal Land Bank, on September 7, 1920, O'Bryan was acting as the agent of the Land Bank, and that it was responsible to Mrs. McFaddin for the misappropriation by O'Bryan of the proceeds of the check. He accordingly rendered judgment in favor of Mrs. McFaddin against the Federal Land Bank for the amount of the check then misappropriated, $1,412.50, with interest from September 21, 1920, and 10 per cent. attorney's fees. It does not appear that his Honor passed upon the question of the foreclosure of his mortgage demanded by the defendant, Carson. From this decree the Federal Land Bank has appealed, as also have the plaintiffs.

The only assignments of error by the Federal Land Bank which are deemed necessary to be considered are:

(1) In not finding that O'Bryan paid to Bland on the Carson mortgage $800.00 on September 9 (10?), 1920.

(2) In finding that O'Bryan was the agent of the Land Bank in the disbursement of the $1,412.50 check, and that the Land Bank is responsible for his defalcation in not applying it to the Carson mortgage. On the contrary, that he erred in not finding that O'Bryan was the agent of Mrs. McFaddin, and that the fault, if any, in trusting to him, and turning the check over to him without taking the precaution to see that he had the mortgage, or that the application be made thereto, was her fault and negligence, chargeable to her, and not to the Land Bank.

The plaintiffs assign error in not awarding Mrs. McFaddin the full amount of damages sustained, $3,978.98, with interest at 8 per cent. from March 1, 1926, and not $1,-412.50, with interest at 7 per cent. from September 21, 1920.

From the view which I take of the case, it will not be necessary to consider the exceptions of the plaintiffs, as, in my opinion, O'Bryan was not such an agent of the Federal Land Bank in the disbursement of the $1,412.50 check

as to make the bank responsible for his misappropriation of the proceeds of the check, and that consequently the plaintiffs are not entitled to judgment for any amount against the Federal Land Bank.

That, therefore, is the controlling issue in the case, upon the discussion of which I shall now enter. The facts are these:

On September 15, 1915, the plaintiffs executed a bond, secured by a mortgage of real estate, to R. J. Bland, for $2,-500.00, due one year after date, with interest from date at 8 per cent. per annum, interest payable annually, and 10 per cent. attorney's fees. The loan was made through S. Oliver O'Bryan, an attorney of good repute at that time, at Manning, a law partner of Judge R. O. Purdy, who was himself a law partner of the mortgagee, Bland, at Sumter. The bond and mortgage were subsequently assigned for value to the defendant, L. S. Carson, who has been ever since, and is now, the owner and holder of the same.

On or about January 30, 1920, Mrs. McFaddin made application to the Federal Land Bank for a loan of $1,500.00 for the purpose of liquidating the balance due on the Bland-Carson mortgage. The loan was negotiated through L. C. Tisdale, secretary-treasurer of the Black River National Farm Loan Association. The bank furnished to Mrs. McFaddin a list of attorneys in Clarendon County, where the land proposed to be mortgaged lay, whose abstracts of title would be accepted by the bank. On it were the names of Purdy & O'Bryan and S. Oliver O'Bryan.

O'Bryan was approached by Mrs. McFaddin to prepare the abstract of title and forward it to the bank, which he did, and it was approved by the bank. The abstract showed the Bland mortgage as an open lien upon the property. The bond and mortgage were prepared in the office of the bank in Columbia, and forwarded to O'Bryan for execution by the mortgagor. Mrs. McFaddin was notified by the bank to go to the office of O'Bryan and execute the papers, which she

did. O'Bryan was directed by the bank to have the mortgage recorded and returned to it, which he did on August 25, 1920.

On September 7, 1920, the bank issued a check for $1,412.50 on the Treasurer of the United States, payable to L. C. Tisdale, secretary-treasurer, and Mary B. McFaddin, borrower, the proceeds of the bond and mortgage for $1,500.00, less certain deductions. It is alleged in the amended complaint, admitted in the answer of the Federal Land Bank, and agreed in the written stipulation of counsel for all parties that the check for $1,412.50 was transmitted to O'Bryan by the Federal Land Bank, with joint instructions to him and to the secretary of the local association, as follows:

Instructions to O'Bryan:

"No part of these funds can be disbursed, should the amount needed to liquidate the entire indebtedness listed below, or otherwise appearing, exceed the amount of the check hereto attached, until the applicant either furnishes sufficient additional funds to enable the attorney to have every incumbrance satisfied, unless a cancellation or postponement of the same be otherwise obtained, and until the attorney has made out the closed loan statement, as per Farm Loan Bureau Form No. 1328 hereto attached, had the same signed by the borrower and duly attested by the secretary-treasurer. There must under no circumstances be any variance from this positive rule."

Instructions to the Secretary:

"This check is made payable to the secretary-treasurer for two reasons: First, *in order that he may supervise the disposition of the funds, as well as require a compliance with paragraphs 1 and 2 hereof.* He must insist, either that the record of each incumbrance be marked satisfied and canceled, or its lien properly postponed of record, at the time the funds are disbursed; and, second, that he may have the closed loan statement, as per the Federal Farm Loan Bureau Form No. 1328 hereto attached, made out by the at-

torney, signed by the applicant, and attested by himself before the check is indorsed for payment. *The secretary-treasurer, therefore, must not under any circumstances indorse the check until this has been done."*

The check, payable as stated to the joint order of Tisdale, the local secretary, and Mrs. McFaddin, was received by O'Bryan in due course. Tisdale and Mrs. McFaddin were notified of its arrival, and in O'Bryan's office *both indorsed the check and left it with O'Bryan.* As the husband of Mrs. McFaddin, who was acting for her, in his letter of November 29, 1924, stated:

"We did receive said sums of money mentioned above, namely, $1,000.00 and $1,500.00, and did on the receipt of same immediately *turn that amount over to Purdy & O'-Bryan, requesting that they have the mortgage given in favor of R. J. Bland canceled."*

O'Bryan either cashed the check or deposited it with the First National Bank of Manning, which transmitted it to the Murchison National Bank of Wilmington, to which it was paid by the Treasurer of the United States, on September 21, 1920.

The application for the loan states that it was desired *"(g) for liquidating indebtedness of the owners,"* and contained the following provision:

"The *applicant agrees,* that, in case the loan, or any part thereof, is for the purpose set forth in the subdivision (g), the funds, or the part thereof, loaned by the Federal Land Bank of Columbia to liquidate the same, *shall be transmitted to and placed in the hands of the secretary-treasurer* of the Black River National Farm Loan Association, *who shall make the proper and necessary disbursement thereof for and on account of the applicant."*

The matter of disbursement of the fund, in violation of the instructions, was thus committed by both Mrs. McFaddin and Tisdale to O'Bryan, who did not apply it to the mortgage. It appears that on *September 10, 1920,* Bland,

representing Carson, received from O'Bryan a check for $800.00, to be applied upon the Carson mortgage. It is fair to assume that this was a part of the proceeds of the bank's check for $1,412.50, dated *September 7, 1920,* received by O'Bryan probably on the 8th, remitted to Bland on the 9th, and credited on the 10th. The remainder of the check, $612.50, appears to have been embezzled by O'Bryan.

It is conceded that Tisdale violated these peremptory and explicit· instructions. By his indorsement of the check without seeing to its application and leaving it in the hands of O'Bryan, who assumed and was permitted to act as disbursing agent, the occasion was created for O'Bryan's appropriation of the money to his own uses. In the application from which the quotation above set out is made Mrs. McFaddin expressly agreed that Tisdale should be the disbursing agent; that he "shall make the proper and necessary disbursements thereof *for and on account of the applicant."* And Mrs. McFaddin, by her indorsement of the check and participation in the wrongful delivery of it to O'Bryan made it possible for Tisdale's breach of duty to enable O'Bryan to appropriate the proceeds of the check.

After the plaintiffs discovered that the Bland-Carson mortgage had not been canceled, this action was commenced July 25, 1924, by them against the defendants, Bland, Purdy, O'Bryan, and Carson, alleging that the mortgage had been paid in full by the plaintiffs to Purdy & O'Bryan, *acting as the agents of Bland;* that the defendants had failed and refused to cancel and mark satisfied the same of record. The plaintiffs demanded judgment that the mortgage be canceled, and for the penalty provided by statute for failure to enter satisfaction upon the record of the mortgage.

The issue between Mrs. McFaddin and the Federal Land Bank, as to who shall lose by the defalcation of O'Bryan, is to be determined by the subsidiary issues: (1) Whose agent was O'Bryan in the transaction culminating in the receipt of the loan funds? And (2) who was most to blame

in affording O'Bryan the opportunity of embezzling the funds?

The question as to which of two parties, equally innocent of *actual participation* in a breach of trust by a third person, shall bear the loss occasioned by such breach of trust, is always a delicate and difficult one. They equally have the sympathy of the Court; the one being entitled to his money, and the other to credit for what he has legitimately parted with as a payment upon his obligation. Nevertheless, however innocent one of the parties to lose may have been of actual participation in the breach of trust, he is not entitled to assert and rely upon such innocence, if by his active co-operation or passive negligence he has materially assisted in supplying to the defaulter the opportunity for the defalcation. It is important, therefore, to compare the conduct of the Federal Reserve Bank with that of the mortgagor, in determining which, if either, was the more culpable.

Considering the conduct of the bank: It appears to me that the bank took extraordinary care to insure the consummation of the deal in safety to all parties concerned. It furnished Mrs. McFaddin with a list of attorneys from which to select one *to make an abstract of her title,* not to complete the transaction. The list contained O'Bryan's name, and *she selected him,* at a time when his reputation was above reproach. He performed the service in a satisfactory manner, reporting the Bland mortgage as an open lien upon the property. The bank approved the loan and mailed to O'Bryan a check for the proceeds, $1,412.50, *payable to the joint order of Tisdale and Mrs. McFaddin,* not of O'Bryan. The deal was being handled through O'Bryan's office, a convenient central point for the parties to meet, as they had met in the initial proceedings—a natural thing for the bank to do, protected as all parties were by the check being made payable to Tisdale and Mrs. McFaddin.

In addition to this, the transmission of the check to O'Bryan was accompanied with joint instructions to O'Bryan and to Tisdale, above set forth, requiring a cancellation or postponement of all prior liens and a certificate *from the borrower* that this had been done; also directing the disbursement of the money by Tisdale and the satisfaction of the prior mortgage entered. "The secretary-treasurer, therefore, must not under any circumstances indorse the check until this has been done." This in compliance with the declaration by the mortgagor, in her application for the loan, that the funds loaned "shall be transmitted to and placed in the hands of the secretary-treasurer, * * * *who shall make the proper and necessary disbursement thereof for and on account of the applicant.*" The instructions further provided:

"The attorney must, without any exception whatever, unless this bank in writing otherwise consents, require the physical production of each note and mortgage and loan deed required to be canceled, satisfied or postponed of record under paragraph 2 hereof, and have the cancellation, satisfaction, or postponement duly noted thereon."

I cannot perceive the slightest evidence tending to show that O'Bryan was the agent of the bank in closing the transaction. Every circumstance is against any such hypothesis. His duties as the agent of the borrower were to examine and report upon the title, which he did; and the only duty imposed upon him as agent of the bank was to receive the transmitted check and turn it over to Tisdale and Mrs. McFaddin, which he did. Nor can we perceive the slightest evidence of negligence on the part of the bank which could possibly have furnished the opportunity for, or facilitated, the embezzlement by O'Bryan. They apparently took every possible precaution to prevent it. It could only have happened by the disregard of the instructions given to Tisdale, O'Bryan, and Mrs. McFaddin.

In my opinion the cataclysm occurred in consequence of the joint negligence of Tisdale and Mrs. McFaddin in delivering the indorsed check to O'Bryan, and intrusting him with the disbursement of the funds which, by the instructions of the bank *and the agreement of Mrs. McFaddin in her application for the loan,* was specifically committed to Tisdale, and with which diversion the bank had absolutely no connection.

There might have been some question as to the participation of Mrs. McFaddin in this diversion, had it not been for the letter, signed by both her husband and herself, dated November 29, 1924, in which, as shown above, it was declared *that the check had been turned over by them to O'Bryan to have the Bland mortgage canceled.* If this did not constitute O'Bryan *her* agent, it would be difficult to conceive of facts that would. There can be no question but that this joint act of Tisdale and Mrs. McFaddin gave O'Bryan the opportunity to embezzle the funds, an act with which the bank was not only not connected but had specifically instructed against.

But even if Mrs. McFaddin should not be held implicated in this diversion and disobedience of instructions on the part of Tisdale, we think it clear that, in the matter of the disbursement of the funds, Tisdale was the joint agent of the bank and of Mrs. McFaddin, and that consequently she has no right to saddle the entire loss upon the bank. He was certainly the agent of Mrs. McFaddin to disburse the fund, as in her application for a loan he was so designated; he was equally the agent of the bank, for the check was transmitted through O'Bryan to Tisdale for that purpose. At most the bank, *in the absence of participation in the diversion by Mrs. McFaddin,* could be held liable for only one-half of the loss.

The conclusion of the Kansas Supreme Court in the case of *Schick v. Warren,* 86 Kan., 812; 122 P., 872; Ann. Cas., 1913-C, 466, appeals very strongly to my sense of justice. In that case the borrower applied for a loan upon incum-

bered real estate. The lender accepted the loan upon condition that the borrowed money be applied to the existing incumbrances. The borrower designated an agent to receive the money, discharge the liens, and pay the surplus to him. The lender accepted the designation and remitted check to the agent, less an advance representing the surplus, which was made directly to the borrower, with specific directions to apply it to the outstanding liens. The agent embezzled the money, and the question arose as to who should bear the loss. The Court held that, as the agent to disburse the fund was the mutual agent of both parties, the loss should be divided, a solomonic decree. The Court said:

"As to the disposition of the money, there was no conflict in the intentions or between the interests of the borrower and the lender; and there was no discretion vested in the agent who was appointed to perform the service. The borrower and the lender each intrusted the agent with the performance of the service. The agent was equally the agent of the borrower and the lender, and the borrower and the lender should equally share in the loss which resulted from the agent's default."

As the evidence shows conclusively that Tisdale was designated as the agent to disburse the loaned funds, and that his desigation was agreeable to and mutually accepted by the bank and Mrs. McFaddin, it follows that he was the joint agent of the parties. If the loss had occurred through the breach of duty of Tisdale, *not participated in by Mrs. McFaddin,* it should be equally divided between them. We do not think that Mrs. McFaddin should be charged with negligence in indorsing the check and delivering it to Tisdale. The check was made payable to both of them, and in carrying out the instructions of the bank that the disbursement be made by Tisdale it was, of course, necessary for Mrs. McFaddin to indorse it. It distinctly appears, however, that she did not content herself with simply indorsing the check and delivering it to Tisdale, *but that she*

*delivered it to O'Bryan, with specific directions to extinguish the Bland mortgage.* See quotation above from the joint letter of the McFaddins, dated November 29, 1924. With this diversion, made by Tisdale *and the McFaddins,* the bank had nothing to do. Even if the statement in the letter should not be accepted at its face value, it is clear that the McFaddins were present and permitted the diversion by Tisdale. We think, therefore, that at least the passive, if not the active, participation by Mrs. McFaddin in the diversion by Tisdale, deprives her of the right to throw even half of the loss upon the bank.

In the case of *Trustees v. Livingston,* 210 Pa., 536; 60 A., 154, the trustees employed one Hunter, an attorney, to see that a mortgage proposed to be given to them by Livingston was a first lien upon the property. There was an existing mortgage, but the attorney certified that the proposed mortgage was the first lien. The trustees then transmitted to Hunter, the attorney, their check for the loan, which was made payable to Livingston, the mortgagor. Livingston then indorsed the check and left it with Hunter for the purpose of his paying off the first mortgage. Hunter embezzled the money. The Court held that Hunter in this part of the negotiations was the agent of Livingston, and that he must bear the loss. The Court said:

"There were acts of negligence, or, what is legally the same thing, acts of misplaced confidence, by both the parties to this suit. Hunter was the agent of plaintiffs to see that the 'proposed mortgage was the first lien upon the property offered,' and, in accepting his false certificate that it was so, the plaintiffs were legally negligent. But upon this certificate they gave him their check, payable, not to him, but to the mortgagor, appellant. Hunter was agent in some respects for both parties, and in the receipt of this check he was undoubtedly acting for appellant; and, when appellant indorsed the check and delivered it to Hunter, it was the same as if the plaintiff had given the appellant the money

in specie, and he had handed it over to Hunter to pay the first mortgage. Instead of so doing, Hunter embezzled the money; and, as the appellant's act in putting it into his hands was the proximate act of negligence which enabled him to carry out the fraud, the appellant, unfortunately for him, must bear the loss."

In the case of *Pepper v. Cairns,* 133 Pa., 114; 19 A., 336; 7 L. R. A., 750; 19 Am. St. Rep., 625, a broker, Ruhl, upon the application of Cairns, negotiated a loan from Sergeant and Pepper, trustees, for $6,500.00. Ruhl prepared and had Cairns to execute, a bond and mortgage which he delivered to Sergeant and Pepper and received a check, *payable to himself,* for the amount of the loan. He used $3,500.00 of the money in the extinguishment of a prior mortgage upon the property, and embezzled the remainder, $3,000.00. In an action for foreclosure of the mortgage given to the trustees, the Court held that Cairns must lose, saying:

"It is urged that Sergeant's act in drawing his check to the order of Ruhl, and not to Cairns, was negligence, and that, on the principle that he who put into the fraudulent hand the means of perpetrating the fraud should bear the loss, Sergeant or his principal should be responsible for Ruhl's act. But this is a misapplication of the principle. The means of committing the fraud may as well be said to be the mortgage, executed by Cairns and left with Ruhl, and by him delivered in exchange for the check. As already seen, Ruhl was Cairns' agent in the application for the money, and was to continue his agent in the use to be made of it. When he brought the mortgage, fully executed, to Sergeant, the latter was justified in paying for it on delivery. He might have paid for it in cash, and his payment by check to Ruhl's order was not different in effect."

If the negotiations had proceeded in the plainly marked out path, by the transmission of the check, even through the hands of O'Bryan, to Tisdale, and he embezzled the money, there could hardly have arisen a doubt that by reason of the

express agreement of Mrs. McFaddin, in her application, that the money should be transmitted to Tisdale and should be disbursed by him, upon her account, the loss would have fallen upon her, at least to the extent of one-half, as the act of her authorized agent. How is the situation altered when she and Tisdale departed from that plain path, without the knowledge or consent of the bank, by constituting O'Bryan the disbursing agent of the fund, instead of Tisdale. In fact, it made it worse. It may well be assumed that, if they had followed the prescribed course, there would have been no defalcation. At any rate, the bank had the right to name the disbursing officer, and, after its designation had been approved by Mrs. McFaddin, the loss directly caused by a deviation from the prescribed course, to which there is no evidence of assent by the bank, or even knowledge, should not be visited upon the bank.

The case of *Atlantic Life Insurance Co. v. Rowland* (C. C. A.), 22 F. (2nd), 126, is very much in point. It was decided October 18, 1927, less than a year ago, and involved a like defalcation of the same O'Bryan. There are some differences in the facts of the two cases, but the differences make a stronger case for the bank in the case at bar. In that case one A. P. Burgess became owner of certain real estate, which was subject to a mortgage given by his grantors to Purdy & O'Bryan for $3,500.00, executed in 1914. Purdy & O'Bryan had assigned the mortgage to one Rowland, of which fact Burgess was informed. In 1918 Burgess applied to the insurance company for a loan of $5,000.00. After inspection the loan was granted, and the insurance company designated O'Bryan *to prepare the necessary papers and to do the other things requisite to close the loan.* O'Bryan prepared the papers and submitted them to the company. They were approved, and the company transmitted to O'Bryan a check for $5,000.00, payable to *Burgess and O'Bryan,* with instructions to O'Bryan to close the loan, subject to the company's legal requirements, payment and cancellation of the

prior mortgage, etc. Burgess indorsed the check and turned it over to O'Bryan, in whom every one at that time had confidence, for the purpose of satisfying the prior mortgage and paying him the difference. O'Bryan paid Burgess the difference and marked the prior mortgage satisfied on the record, so notifying the company. Instead of paying off the prior mortgage, he embezzled the money which should have been so applied. For several years he paid Rowland the interest upon the prior mortgage owned by him, as if it were still open. Eventually the crash came, and Rowland ascertaining the facts brought suit to foreclose his mortgage. Burgess demanded that the insurance company be made a party to the suit, which was allowed, and Burgess set up a claim against the insurance company, similar to that set up in the case at bar, that it was liable to him for the amount of the loan funds embezzled by O'Bryan.

In passing, two striking differences between that case and the case at bar will be observed: (1) In the *Rowland case* O'Bryan was designated by the insurance company as its agent to prepare the papers and "to do the other things requisite to close the loan." In the case at bar, O'Bryan was selected by Mrs. McFaddin from a list of attorneys furnished by the bank, simply to examine the title and report to the bank; he was charged with nothing else, and had nothing to do with the distribution of the funds, except to receive the check transmitted to him and deliver it to Tisdale and Mrs. McFaddin, to be disbursed by Tisdale. (2) In the *Rowland case,* the check was made payable to Burgess, the borrower, *and O'Bryan;* in the case at bar, the check was made payable to Tisdale and Mrs. McFaddin. O'Bryan was not concerned in either the receipt or the handling of the money. All that he had to do was to deliver the transmitted check to the payees.

The Court, recognizing the principle that, "whenever one of two innocent persons must suffer by the act of a third, he who has enabled such third person to occasion the loss

must sustain it," held that throughout the entire transaction there was nothing to show that the insurance company did anything that was negligent or left anything undone that was in any way careless, but that the action of Burgess in indorsing the check payable to O'Bryan and herself, and turning it over to O'Bryan, enabled him to steal the money; that Burgess was negligent in making no demand for the evidence of the debt; that the very fact that the check was made payable to both jointly imposed upon Burgess the responsibility of at least keeping some check on the transaction which he neglected. The case at bar is much stronger in favor of the lender than the *Rowland case,* for here the act of Tisdale and Mrs. McFaddin committed to O'Bryan, who had nothing to do with it, the power to disburse the funds and the consequent opportunity of embezzling it.

It is true that in the *Rowland case* the Court held that O'Bryan was the agent of both the lender and the borrower, which appears to be justified by the facts of the case; but we do not understand that that was the basis of the decision. It was rather the negligence of Burgess which opened the door to the defalcation. Really the parallelism upon this point of joint agency is with reference to Tisdale, and not to O'Bryan.

I do not at all agree with the following statement in the opinion of Justice Thurmond:

"The Court thinks the conclusion is irresistible, under the facts in this case, *that O'Bryan was the agent of the Federal Land Bank in disbursing the check.*"

Against this "irresistible" force, are the "immovable" obstructions that in the application of Mrs. McFaddin for the loan was the express agreement that the funds "loaned by the Federal Land Bank of Columbia to liquidate the same [owner's indebtedness] *shall be transmitted to and placed in the hands of the secretary-treasurer, * * * who shall make the proper and necessary disbursement thereof for and on account of the applicant,"* and that the check was issued

by the bank, payable to Tisdale and Mrs. McFaddin, with specific instructions that the fund should be disbursed by *Tisdale*. I do not find a suggestion in the case that justifies the foregoing statement. It seems strange that the most studied effort to avoid constituting O'Bryan its agent to disburse the fund, and a specific designation of another to perform that service, should lead to the "irresistible conclusion" that O'Bryan had been so appointed.

Nor with the following statement:

"The application of Mrs. McFaddin stated that the money realized from the loan was to be used in liquidating her indebtedness. This was notice to the Federal Land Bank, when it mailed its check to O'Bryan, *who was to disburse the money,* that the money represented by the check was to be paid on the indebtedness of Mrs. McFaddin."

In the very application referred to, it was distinctly agreed that the fund should be disbursed by Tisdale, as the agent of Mrs. McFaddin. There is absolutely nothing to show that O'Bryan was to disburse it as the agent of the bank. It is hardly reasonable to suppose that the bank would designate two separate individuals to do the same service.

Nor with this:

"O'Bryan made the abstract, and it was approved by the Federal Land Bank. The check was made payable to her [Mrs. McFaddin] and L. C. Tisdale, secretary-treasurer, but forwarded to O'Bryan; but the indorsement of said check by the payee (payees?), while necessary, was simply formal, in that transaction, *for the money was to be disbursed by O'Bryan."* (Italics added.)

If the money "was to be disbursed by O'Bryan," that commission emanated from Mrs. McFaddin and Tisdale, not from the bank, which had specifically directed the disbursement to be made by Tisdale, to which Mrs. McFaddin had explicitly agreed "for her account."

In paragraph 6 of the stipulation of counsel it was agreed as a fact:

"(6) That said check, copy of which is hereto attached as Exhibit F, was according to the practice and custom of said bank, forwarded to S. Oliver O'Bryan, said check being made payable to Mary B. McFaddin and L. C. Tisdale, as secretary of Black River Farm & Loan Association, with instructions as appears on Exhibit G, copy of which is hereto attached."

Exhibit G contains the instruction, above set out, that the check was made payable to Tisdale, "in order that he may supervise the disposition of the funds," etc. Not only this, but in the point letter of November 29, 1924, signed by both Mr. and Mrs. McFaddin, they declare that the check was turned over *by them* to O'Bryan for the purpose of canceling the Bland mortgage.

Besides, paragraph VII of the stipulation recognizes the fact that $1,412.50 check was delivered by Mrs. McFaddin to O'Bryan:

"VII. The parties being unable to agree as to whether or not any moneys were furnished by Mary B. McFaddin to S. Oliver O'Bryan, or Purdy & O'Bryan, *outside of and beyond the check of Federal Land Bank for $1,412.50, for the purpose of paying up the Carson mortgage,* it is agreed that testimony on this point shall be taken."

Equally unsupported by the evidence is the following statement:

"So, while the Federal Land Bank and Mrs. Mary B. McFaddin were both innocent parties, Mrs. McFaddin evidently went to O'Bryan because directed to him by the Federal Land Bank, and delivered to him the check indorsed as aforesaid, *as required to do by the Federal Land Bank,* and the Federal Land Bank relied upon [O'Bryan] to see that the record was clear and *the loan closed and the money applied to the indebtedness of Mrs. McFaddin.* O'Bryan was required to follow the directions of the Federal Bank, and not the directions of the plaintiff, Mrs. McFaddin."

How it can be said that the bank required Mrs. McFaddin to indorse the check and *deliver it to O'Bryan,* in the face of its direction to deliver it to Tisdale, to be disbursed by him, explicitly agreed to by Mrs. McFaddin, passes my comprehension, or that the bank relied upon O'Bryan to apply the money to the indebtedness of Mrs. McFaddin, in the face of its explicit direction, agreed to by Mrs. McFaddin, that the disbursement was to be made by Tisdale. It is hard upon Mrs. McFaddin to have to suffer from the criminal conduct of O'Bryan, *but it was she who trusted him, not the bank;* it most explicitly declined to do so.

In fact, the opportunity which O'Bryan seized upon to misappropriate the money was supplied by the indorsement and delivery of the check to him by Tisdale and Mrs. McFaddin, and not by any act of the bank, which had so studiously arranged for a different method of distribution. It must also be considered, and we think it of great importance, that it was clearly understood that the bank was to have the first lien upon the property; the money was being raised for the purpose of retiring the Bland mortgage, thereby obtaining a loan at a less rate of interest and running for a longer time; it was incumbent upon Mrs. McFaddin to see that the bank got what it was bargaining for, and which she undertook to give.

The case of *Kirkpatrick v. Warden,* 118 Va., 382; 87 S. E., 561, strongly supports the contention of the bank in the case at bar. There Miss Warden applied to Kirkpatrick & Howard, mortgage brokers, for a loan of $1,000.00; the brokers required an abstract of title, and suggested a particular attorney, or any other reputable attorney at the bar; Miss Warden adopted the suggestion, and the attorney suggested prepared the abstract; the brokers then transmitted a check for $970.00, payable to Miss Warden's order, with a bond and deed of trust for her to sign, to the attorney, and directed him to see to the discharge of certain liens; Miss Warden signed the bond and deed of trust, indorsed the

check, and delivered all to an agent of hers to deliver to the attorney; the attorney transmitted the bond and deed of trust to the brokers and appropriated the $970.00 check, without satisfying the liens. In an action by the brokers against Miss Warden to foreclose what was equivalent to a mortgage, the Court, reversing the trial Court, held that, as Miss Warden had executed the papers, indorsed the check, and through her agent delivered all to the attorney, she opened the way to his embezzlement, and must stand the loss. The Court said:

"If [the brokers] had intended [the attorney] to pay the money out as their attorney, they would have made the check payable to him. They did not intrust him with the money, and the power to use the proceeds of the check was conferred upon him by Miss Warden. If, therefore, he can be regarded in any sense as the agent of [the brokers], he certainly cannot be regarded as their agent to receive the money. This power to collect the check was conferred solely by her at the same time that she intrusted him with the executed mortgage and bond. At the time of the misappropriation he certainly had *her* money, and not the money of * * * [the brokers]. * * * "

A course of reasoning which aptly fits the facts of the case at bar. The paraphrasing would be complete by reading "the bank," instead of "the brokers," and "Mrs. McFaddin," instead of "Miss Warden."

In the case of *Henken v. Schwicker*, 174 N. Y., 298; 66 N. E., 971, the defendant, Schwicker, secured a mortgage loan from the plaintiff, Henken, for the purpose of satisfying certain liens upon the property mortgaged. Henken, the mortgagee, on the assurance of Dreher, the broker negotiating the loan, that his mortgage would be a first lien, drew a check *to the broker's order,* which the broker deposited to his own credit. Thereafter Schwicker, the mortgagor, delivered the executed bond and mortgage to the broker, with instructions to pay off the prior mortgage, and allowed him

to retain the funds for that purpose. The broker appropriated them to his own use. It was held that, as the broker was the agent of Schwicker, the mortgagor, the mortgagor was liable to the holder of the new mortgage for the entire amount of the debt. The Court said:

"As the mortgage to the plaintiff was concededly to be a first mortgage, it was clearly the duty of the defendant to see that the prior liens were paid out of the proceeds of the loan, and, when the latter acquiesced in Dreher's retention thereof for that avowed purpose, it amounted to an implied, if not an express, delegation of authority to Dreher to do that which it was the defendant's duty to do."

The facts unquestionably show that all through these transactions O'Bryan was acting as the agent of the McFaddins. Payments were made to him to be remitted to Bland. They turned the check over to O'Bryan "to credit my mortgage with it." They paid the last payment to him, and took his receipt in full.

Attention should be called to the fact that, notwithstanding the answer of the defendant, Carson, sets up a claim to the foreclosure of the Bland mortgage, which had been assigned to him, which mortgage is admitted in the stipulation of counsel to be the first lien upon the property, there has been no adjudication fixing the amount due upon said mortgage, or granting relief to him in the case.