CITIZENS SAVINGS BANK, F.S.B.;
American Home Funding, Inc.,
Plaintiffs–Appellants,

v.

VEREX ASSURANCE, INC.,
Defendant–Appellee,

v.

Arthur PEARCE; L. David Strickland;
Mariner's Cay Development Corporation; Robert G. Irick; John H. Disher,
III; Disher, Hamrick & Myers; Franklin E. Robson, Third Party Defendants
(Two Cases).

CITIZENS SAVINGS BANK, F.S.B.;
American Home Funding, Inc.,
Plaintiffs–Appellees,

v.

VEREX ASSURANCE, INC.,
Defendant–Appellant,

v.

Arthur PEARCE; L. David Strickland;
Mariner's Cay Development Corporation; Robert G. Irick; John H. Disher,
III; Disher, Hamrick & Myers; Franklin E. Robson, Third Party Defendants.

Nos. 88–2554, 88–2555 and 88–2566.

United States Court of Appeals,
Fourth Circuit.

Argued April 11, 1989.

Decided Aug. 23, 1989.

John Randolph Pelzer (Pelzer & Associates, P.A., on brief), Charleston, S.C., Benjamin Zelermyer (Serchuk, Wolfe & Zelermyer, on brief), for defendant-appellant.

G. Dana Sinkler (Sinkler & Boyd, P.A., on brief), Charleston, S.C., for plaintiffs-appellees.

Before CHAPMAN and WILKINS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

CHAPMAN, Circuit Judge:

Citizens Savings Bank (Citizens) and American Home Funding, Inc. (AHF), a subsidiary of Citizens, (together referred to as Lenders) following an adverse jury verdict, appeal four rulings of the district court. They challenge the court's jury instruction on the elements of fraud, the denial of a directed verdict on the issue of agency, the court's instruction on imputation of knowledge from an agent to his principal, and the exclusion of a revised 1985 Master Policy. Verex asserts that those rulings were correct but cross-appeals the court's refusal to charge the jury that pervasive fraud is a ground for rescission of private mortgage insurance not requiring findings of fraud on each unit. We find no error in these rulings of the district court, and we affirm.

## I.

This case involves private mortgage insurance (PMI) covering loans at the Mariner's Cay condominium development in Folly Beach, South Carolina. This insurance protects lenders, such as Citizens, against loss from defaults in loan payments by borrowers who have bought condo units and financed a part of the purchase price with a mortgage loan from Citizens. Citizens is a federal savings bank located in Ithaca, New York. Verex is a mortgage guaranty insurance company located in Madison, Wisconsin. Other principal parties are: Art Pearce, president of Citizens; Mariner's Cay Development Corporation, (Seller) co-developer and seller of Mariner's Cay condominium units; Robert Irick and Robert Doran, shareholders and officers in the Mariner's Cay Development Corporation and co-developers of Mariner's Cay; and Franklin Robson, closing attorney on most of the purchases.

During 1982 and 1983, Mariner's Cay Development Corporation (Seller) sold the Mariner's Cay units, financed primarily through AHF. However, the AHF financing was available only if the purchaser put down at least 10 percent of the unit's price. The Seller would recommend that the purchaser use Robson as closing attorney. Although the Lenders (Citizens and AHF) state that the purchasers were free to choose any attorney, one purchaser testified that he was not permitted to use his own attorney instead of Robson.

AHF sent Robson detailed closing instructions, in which he was directed to send AHF the premium payment authorization and the "Affidavit to Mortgage Insurance Company Regarding Equity," completed by the purchasers, the Seller and himself. He was also instructed on what information should be included in the mortgage.

Before a loan closed, the Lenders would submit a "Commitment to Insure" request to Verex. In this form, the Lenders included information of the expected terms of the sale and loan transactions, including the sales price, the appraised value and the loan-to-value ratio. The Commitment to Insure stated that the purchasers would put down at least 10 percent of the purchase price and that any Certificate of Insurance issued by Verex would insure only the loan as described in the Commitment. Verex would then issue a Certificate to the Lenders which would be re-submitted to Verex after the closing.

There is no dispute that the final loans made were not those described in the Commitments. Purchasers received cash rebates or kickbacks from Seller at the closings as part of what was in reality a 100 percent financing scheme. These kickbacks were part of a pre-arranged deal between Seller and the purchasers by which the down payments were to be refunded. A separate side agreement, not included in the documents presented to the

Lenders or Verex, expressly provided for the refund. As all parties state, "the kickbacks allowed the purchasers-borrowers to achieve 100 percent financing by falsely stating that the sales price of the property was 10 percent higher than it actually was and by securing a 90 percent loan on the inflated sales price. The sales price was inflated because the 10 percent cash down payment to be made by the purchasers was refunded to the purchaser at closing."

These kickbacks were arranged by Robson at the direction of the Seller and the purchasers. At the closing, the purchaser would write a check to Robson for the full amount due as shown on the closing statement. These funds were then deposited in Robson's escrow account. Robson then disbursed the money to Seller who in turn deposited the money in Robson's name into Mariner's Cay's escrow account. Finally, Robson would write a "rebate" check to the purchasers in the amount of their down payment. However, this second escrow account was not opened until after approximately 20 closings had been completed. Before the second account was opened, the kickbacks were apparently made through Robson's personal escrow account.

In August 1982, AHF became aware that white-out was being used on certain appraisals and HUD–1 Settlement Statements. These Settlement Statements showed entries for "payoff on furniture" and "refund of deposit and interest." Although the Lenders received these statements, Verex did not. In September 1982, Art Pearce went to Charleston to conduct a surprise audit, and he learned that some of the units had been sold furnished and others were being leased back from the purchasers. He discovered that some of the loan closing statements contained references of a "payoff to Linker." The developers told Pearce that this referred to a rebate of the sales proceeds to the developers for purchase of furniture for the units, a standard resort practice. Pearce had this "standard practice" confirmed by other resort developments. However, Pearce also ordered independent appraisals on two units, confirming their values as stated in the loan documents. At no time was Pearce explicitly told about the down payment kickbacks. Pearce further advised the developers and Robson that money was not being lent for furniture purchases, and if any such purchases were involved, they were not to be included as part of the real estate transaction and were not to be shown on the Settlement Statements.

Meanwhile, Pearce made several notes in which he questioned the price of the units sold to insiders, the independence of Robson and the validity of the PMI itself. At this time the Lenders had a direct financial interest in the unit sales. As the construction lenders, they received a percentage of the sales price for each unit sold. As the permanent lenders, they received an up-front fee of $150, a closing fee of 2 percent, and origination fee of 1.5 percent and up to 3 percent for a buy-down.

When Verex learned of the kickback scheme, it attempted to rescind the Certificates. The Lenders then filed suit in federal court, under diversity jurisdiction, alleging that Verex had wrongfully attempted to rescind 52 Certificates. Verex counterclaimed, alleging that the Certificates were invalid because of misrepresentations by the Lenders' agents, the broker and the closing attorney, whose knowledge of the fraud must be imputed to the Lenders.

After a jury trial, a verdict was returned finding that Verex could rescind 34 of the Certificates, but also finding that 18 Certificates were still valid. Since the jury found fraud, punitive damages were required under South Carolina law, and the jury awarded only $1.00 in punitive damages to Verex.

## II.

In South Carolina, the issue of agency is one of fact for the jury, *Jones v. Thomas & Hill, Inc.*, 265 S.C. 66, 70, 216 S.E.2d 871, 873 (1975), and "where there are *any* facts giving rise to an inference of an agency relationship" (emphasis in original) the issue is for the jury. *Fernander v. Thigpen*, 278 S.C. 140, 141, 293 S.E.2d 424, 425 (1982).

## III.

In the present case, a primary issue was whether Robson was an agent of the Lenders. The Lenders contend that the district court should have decided the issue as a matter of law, by interpreting their original closing instructions as sent to Robson. However, Verex presented evidence, in addition to the original closing instructions going to the issue of Robson's agency. This evidence was that the purchasers did not have the right to select their own closing attorneys instead of Robson. There was also evidence of Pearce's meeting with Robson in Charleston in September 1982 to discuss closing procedures.

Pearce instructed Robson not to use white-out on future documents and also instructed him as to the handling of furniture allowances on HUD forms. This was evidence that the Lender had the right to control how Robson discharged his duties as an attorney.

Robson's fee was paid by the Purchaser, at the time of closing, by withholding the amount of the fee from the proceeds of the loan, but this only raises an inference under South Carolina law that the attorney is the purchaser's agent. Other facts and circumstances may establish that the attorney is the agent of the Lender. *Jones v. Thomas and Hill, Inc., supra.* There is sufficient evidence in the record to support a finding that Robson was an agent of the Lenders and that they are chargeable with knowledge of his kick back or refunding of the down payments.

In South Carolina actual knowledge by the principal is not necessary to hold him liable for the frauds, deceits, misrepresentations and other malfeasances of the agent when the agent is acting within the scope of his agency. (*State Ex Rel. McLeod v. C & L Corp., Inc.*, 280 S.C. 519, 527, 313 S.E.2d 334, 339–40 (S.C.App. 1984).

The jury came to a fair resolution of the agency question. Obviously, Robson was not acting alone in the fraudulent kickback scheme. Although the Lenders contend that they should not be charged with the fraud of Robson, it is equally clear that

neither should Verex bear the loss caused by Robson's deception. "Where one of two innocent persons will suffer for the wrongful act of [a] third, [the] one who was most at fault in letting it be brought about will be required to bear the loss." *McFaddin v. Bland*, 147 S.C. 27, 35, 144 S.E. 592, 594 (1928). *Accord, Atlantic Life Insurance Co. v. Rowland*, 22 F.2d 126 (4th Cir.1927). As the *Atlantic Life* court stated, "[s]ituations often arise where one of two innocent persons must suffer from the wrongs of a third, and where the courts, through compulsion, are obliged to impose a hardship upon one to save a loss to the other. The maxim decisive of such cases is that the loss must fall upon the one who comes the nearer to responsibility for the wrong of the offender." *Id.* at 130. *Rowland* also involved a closing attorney who committed a fraud upon a borrower and a lender.

The facts of *McFaddin* are particularly relevant because in *McFaddin* the closing attorney was to pay off a previous mortgage of the borrower using the proceeds from a lender's check made out in the borrower's name. The closing attorney had been selected by the borrower from a list of acceptable attorneys provided by the bank. Only attorneys on this list would be approved by the bank. However, the attorney embezzled the funds, and the South Carolina Supreme Court held that the trust committed to the attorney by the lender made the fraud possible. Therefore, since the lender had placed the attorney in the position to commit the fraud, it must bear the loss. The Court also found that in disbursing the loan check at closing the attorney was the agent of the lender.

As between the Lenders and Verex, the Lenders were much closer to Robson. They knew of the close connection between Robson and the developers. They also sent Robson detailed closing instructions, and Art Pearce examined Robson's records and gave him additional instructions in September 1982 while visiting Charleston to check on irregularities in the loan closing procedures. Although it may be regrettable that either party must suffer a loss, the Lenders put Robson in a position to commit

the fraud, and the jury decided they must bear the loss.

### IV.

 Both parties complain of the district court's charge. The Lenders challenge the court's instructions on the elements of fraud. The charge which the district court gave stated the essential elements of fraud. In fact, the district court's charge enumerated nine elements while the charge which the Lenders sought contained only five. Since the elements contained in the charge contained all five elements in the Lenders' charge, any resulting error was harmless.

As to the charge on the weight of the evidence, the district court quoted the language of *Gilbert v. Mid–South Machinery Co.*, 267 S.C. 211, 227 S.E.2d 189 (1976), in which the court stated:

> Fraud must be established by a preponderance of the evidence ... However, the courts have frequently stated that the fraud must be established by evidence that is ... clear, cogent, and convincing ... These expressions, however, have been interpreted to mean only that there must be a preponderance of evidence sufficient to overcome the presumption of innocence of moral turpitude or crime, and, while the evidence must be clear and convincing, such clear and convincing proof may be met by a preponderance of the evidence.

*Id.* at 222–23, 227 S.E.2d at 194. Since the court charged the exact language of *Gilbert*, we find the charge proper.

Finally, Verex argues that the district court erred in failing to charge that pervasive fraud is a ground for rescission of all private mortgage insurance issued in connection with a development and negates the need for finding fraud in connection with each individual unit. We believe that the district court's instructions were adequate and followed the law of South Carolina. Verex submits no case law in support of its claim that pervasive fraud is itself a ground for total rescission. Each individual certificate of insurance was a separate transaction requiring separate proof. Verex argued to the jury that fraud in connection with the sale of one unit could inflate the price of units subsequently sold. It was for the jury to decide what effect the fraud had on the PMI for each unit, and we find no error in the district court's instructions.

### V.

The final issue is whether the district court improperly excluded evidence of a 1985 revision in Verex's Master Policy controlling all PMI issued. The district court found this evidence to be irrelevant to the case and would tend to confuse the jury. We find no abuse of the district court's discretion in excluding this proposed exhibit.

AFFIRMED.